720 S.E.2d 572

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Elizabeth Dawn THORNTON, Defendant Below, Appellant.**

No. 35533.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 2011.

Decided June 22, 2011.

George Castelle, Esq., Ronni M. Sheets, Esq., Kanawha County Public Defender Office, Charleston, WV, for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Barbara H. Allen. Esq., Assistant Attorney General, C. Casey Forbes, Charleston, WV, for Appellees.

PER CURIAM:

This case is before the Court upon the appeal of Elizabeth Dawn Thornton (hereinafter referred to as "Appellant") from the

August 17, 2009,[1] final order of the Circuit Court of Kanawha County, West Virginia, in which she was sentenced to an indeterminate sentence of three to 15 years in the state penitentiary for her conviction of child neglect resulting in death, as contained in W. Va.Code § 61–8D–4a (2010 Repl.Vol.).[2] After a thorough review of the briefs, the legal authorities cited, the arguments of the State and appellant as well as the record presented for consideration, we find that the circuit court committed no reversible error and therefore affirm the conviction and sentencing order.

I.

FACTUAL AND PROCEDURAL BACKGROUND

On May 29, 2008, 22–month–old Constantine Alexander (known as Alex) Washburn, the child of the appellant, was brought by ambulance to Charleston Area Medical Center. He was unconscious and bruised on his forehead, chin, arms, legs and back. His forehead was swollen and his brain was severely traumatized. Emergency room personnel were immediately concerned that the explanations for the child's injuries given by the appellant and the child's father, Christopher Washburn[3], did not appear to be consistent with the child's injuries. Alex died two days later on May 31, 2008. The State acknowledged throughout the proceedings that it did not know who inflicted the injuries upon young Alex.

On June 5, 2008, the appellant was arrested for child neglect resulting in death. The State alleged that the appellant should have sought earlier medical treatment for Alex, and that this medical neglect resulted in the child's death. The appellant was indicted on

charges of child neglect resulting in death in September of 2008. Her jury trial commenced on January 9, 2009. At trial, the State theorized that the child was injured several days prior to his death on May 31, 2008.

Prior to the start of her criminal trial, the West Virginia Department of Health and Human Resources (hereinafter "DHHR") instituted a child abuse and neglect proceeding against the appellant and Christopher Washburn, seeking custody of their three other children in part because of the failure of the two to seek appropriate medical treatment for Alex. The DHHR proceedings involved many of the same witnesses who would later be called to testify in the criminal trial. Because of this overlap in witnesses, prior to the beginning of the trial, the appellant made a pretrial motion in limine to prohibit the State from introducing testimony from the child abuse and neglect proceeding. The appellant argued that the burden of proof for the DHHR proceeding was less than that for the criminal charge she was facing, and that introduction of this earlier testimony would lead to confusion for the jury. The discussion between the State, the appellant and the court was as follows:

APPELLANT: "First a motion in limine to exclude testimony about, let me just call them related proceedings. There is a statutory prohibition on related proceedings being disclosed to the public. There is a different standard of proof in those related proceedings, a lower standard of proof, so that any evidence about them referred to in this proceeding, especially any rulings made would be misleading and confusing to the jury."

STATE: "Not going to offer any evidence—I didn't mean to cut George off.

---

1. The appellant's trial commenced on January 7, 2009. She was convicted on January 14, 2009. *The original sentencing date was May 12, 2009.* In order to extend the time for the filing of this appeal, the appellant was resentenced on the original conviction on August 17, 2009.

2. W. Va.Code § 61–8D–4a states:
 (a) If any parent, guardian or custodian shall neglect a child under his or her care, custody or control and by such neglect cause the death of said child, then such parent, guardian or

custodian shall be guilty of a felony and, upon conviction thereof, shall be fined not less than one thousand dollars nor more than five thousand dollars or committed to the custody of the division of corrections for not less than three nor more than fifteen years, or both such fine and imprisonment.

3. Christopher Washburn was also indicted on a charge of child neglect causing death and was also convicted in a separate proceeding. His conviction is not subject of this appeal.

APPELLANT: All witnesses should be instruction (sic) not to—there may be a need to refer to testimony for impeachment purposes, but if they're just referred to it as related proceedings or previous testimony or something.

THE COURT: All witnesses that the State and the defense has (sic) should be admonished to say other proceedings.

In its opening statement, the State mentioned that one of its witnesses, Dr. Jillian McCagg, called CPS[4] when she saw the child's injuries. The appellant objected to the mention of CPS by the State and moved for a mistrial. The State responded that it merely referenced CPS in relation to Dr. McCagg's reaction and that no reference was made to CPS proceedings or testimony. The circuit court noted the appellant's objection, denied the motion for a mistrial, and offered a limiting instruction, which was declined.[5]

During her direction examination by the State, CPS was again mentioned by Dr. McCagg. In responding to a question by the State, Dr. McCagg mentioned that CPS had been contacted. She did not discuss any proceedings and only stated that the organization was called. The appellant again objected to the mention of CPS by Dr. McCagg and moved for a mistrial. As before, the motion for a mistrial was denied by the circuit court.[6]

---

4. CPS is an abbreviation for Child Protective Services, a division of the DHHR whose duties include the investigation of child abuse complaints.

5. The colloquy between the court, the State and the appellant is as follows:

STATE: You will hear from Dr. McCagg, she is a resident in general surgery at CAMC hospital. She will tell you she was in the emergency room that evening when little Alex was brought in. She will tell you that she observed the child's body, she observed the bruises and she became angry at what she saw. And asked that CPS be contacted, Child Protective Services, when she saw the child. She will tell you about what she observed, injuries she saw on Alex's body when he came in to the hospital that afternoon. And she will tell you she saw those injuries within 20 minutes of him arriving at the hospital. You will also hear from Dr. McCagg that—

APPELLANT: Your Honor, may I approach the Bench?

THE COURT: You may.

(A Bench conference was then held, out of the hearing of the Jury, without the Defendant.)

APPELLANT: Judge, we had filed a pretrial motion about reference to CPS and the motion was granted. That it's my understanding based upon the Court's ruling there would be no references to CPS proceedings or CPS participation in any form in this case. And the prosecutor just informed the jury that Dr. McCagg became angry at what she saw and instructed that CPS be called. I think that's a violation of what—whether it's intention or inadvertent, it's a violation of the Court's ruling. I move for a mistrial because of the prejudicial nature of CPS proceedings. Plus the statutory prohibition on disclosing that to the public.

STATE: Judge, I didn't comment on any CPS provision or proceedings. Dr. McCagg realized what the injuries were and asked what she was required to do. She be contact (sic) I am not going to comment on any proceedings or what CPS (sic). I could call the CPS (sic) I am going say (sic)by by the Court's ruling and not do that. But certainly I could (sic) I am not violating any court order (sic) I am not going to get into proceedings or mentioning anything about CPS that stated from the doctor what actions she took, not what CPS did.

. . .

THE COURT: She called them.

STATE: She said they need to be contacted.

THE COURT: So I'm just going to leave that at that. Note your objection. Do not get into that. We covered that ground once and I don't want to get another trial in a trial on this thing.

STATE: I am not going to get into CPS proceedings.

THE COURT: Do I need to give a cautionary instruction?

APPELLANT: Probably a cautionary would bring it to their attention more so.

6. APPELLANT: Your Honor, this is the second time that a State's witness has mentioned or the first time it was in opening statements. I move (sic) for a mistrial at that time because of the violation of what I understand to be a court ruling that a motion in limine, that CPS information not be given to this jury.

This is the second time that its (sic) been introduced or been referred to in the presence of the jury. For a second time I move for a mistral because of the enormously prejudicial affect (sic) of CPS.

THE COURT: She been—has she been told not to?

STATE: No. My understanding is she mentioned that they contact CPS but did not to get into.

THE COURT: Is that all she said?

STATE: It would be a violation for her not to contact CPS in such a circumstance. I am not going—

The State offered testimony by a number of individuals. Jeffrey D. Meadows, a sheriff's deputy, spoke to the appellant and Christopher Washburn about the child's injuries while the paramedics were attending to the child.[7] Deputy Meadows testified that the appellant stated that Alex was eating chicken broth at the kitchen table when his breathing became labored and he became unresponsive and limp. Deputy Meadows testified further that both the appellant and Washburn told him that Alex had been sick for four or five days, and they feared he was becoming dehydrated because of vomiting and diarrhea. The appellant stated that she wanted to take him to the hospital but could not because of a lack of transportation.

Also testifying on behalf of the state were the paramedics who responded to the emergency call for assistance. Each paramedic detailed the steps taken to administer emergency care to Alex, who was unconscious at the time they saw him. One of the paramedics, Albert LaRue, testified that the child had a noticeable, large bruise on his forehead. He did not recall a bruise on the child's chin. He denied that any of the emergency procedures would have led to the bruising apparent on the child's body from hospital photographs.

A second EMT, James Thompson, accompanied Mr. LaRue on the call. EMT Thompson testified that Alex was completely limp, non-responsive, not crying and not making any type of noise when he was carried to the ambulance by EMT LaRue. EMT Thompson stated that he saw the appellant, who was upset and shaking at the time. He assisted in getting Alex ready for transport to the hospital, hooked up equipment to monitor his heart rate and breathing, and assisted in starting an IV and placing an oxygen mask on the child's face. As part of placing the oxygen mask on the unconscious child's face, EMT Thompson testified that he would have had to place his fingers beneath the child's chin to make certain the airway was unobstructed. He denied that the actions taken to stabilize Alex's head for transportation and unobstructed breathing would have been violent but were gentle and required no force.

Laken Southall, a critical care transport nurse, testified that he was one of the medical personnel who responded and tended to the child's injuries. He testified that when he arrived at the appellant's apartment complex, Alex was already in the back of the ambulance. Nurse Southall testified that he went to the ambulance to assist the other emergency personnel. He stated that there were six to eight people standing near the ambulance, including the appellant and Mr. Washburn. Nurse Southall testified that both the appellant and Mr. Washburn rode with him in the ambulance to the hospital. During their ride to the hospital, according to Nurse Southall, the appellant did not say anything while Mr. Washburn talked on his cell phone.

Jay Albright, a critical care paramedic who assisted in this call, testified about additional steps taken by the emergency personnel. Paramedic Albright testified that he placed a nasogastric or NG tube, which went through the mouth or nose into the child's stomach, to help decrease the air in the child's belly and to reduce the chance of aspiration of stomach contents into the child's airway. He testified that once the NG tube was placed, one-half of a teaspoon of stomach contents was removed, an amount he called small. He also testified that none of the emergency actions would have caused the bruising apparent on the child's chin.

THE COURT: I'm not talking legal duty to contact them, talking about getting into it in front of the jury in this case.

STATE: I am not going to ask her any questions about that.

STATE: Noot (sic) about any investigation or anything like that.

THE COURT: All right. So—

APPELLANT: Before we proceed, can I at least request that the prosecution to notify all their witnesses not to refer to CPS proceedings so I don't have make a third motion for a mistrial. And note my objection.

7. Deputy Meadows was not called to investigate this incident but was working a security detail for the apartment complex where the appellant and her family resided. Security was required because of extensive remodeling projects throughout the apartment complex where the appellant resided.

Another witness for the state was Christina Carnell, a longtime friend of the appellant. Ms. Carnell was present when Alex fell several days prior to this death after he hit his head on the coffee table while spinning around. She recalled that Alex had a bruise about the size of a penny on his forehead and that he was vomiting both before and after he hit his head on the coffee table. Ms. Carnell testified that the appellant and Mr. Washburn talked about taking him to the hospital, but were afraid to do so because of the bruise on the child's head. She also saw Alex on Wednesday, May 28, 2008, in the morning. The next evening, she dropped by the home of the appellant and knocked on the door for entry. The appellant answered the door, stating "Tina, thank God you are here." Once in the home, Ms. Carnell saw Alex on the floor, unconscious, and watched the appellant attempting to revive him. Ms. Carnell testified that the appellant directed her to call Mr. Washburn, which she did. She then called 911 for assistance. Ms. Carnell admitted that, at the request of the appellant, she initially lied to paramedics by telling them that she was present when the child became unconscious and that the child was drinking broth just prior to his loss of consciousness.

The appellant's mother, Elizabeth Gerlach, was called as a witness by the State. Ms. Gerlach testified that the appellant told her about Alex's fall. She testified that the appellant told her the child was a little delirious, and that all he wanted to do was sleep. Ms. Gerlach also testified that the appellant told her the child was vomiting. Ms. Gerlach suggested to her daughter that she should take the child to the hospital in case he had a concussion.

Dr. Jillian McCagg, a third-year surgical resident at Charleston Area Medical Center, testified about her treatment of Alex in the emergency room. She testified that Alex was bruised along the forehead and jaw line, and that he had swelling of his forehead. Alex was also bruised along his arms, legs, back and side. When Alex arrived in the emergency room, he was unconscious, was not responsive to stimuli, and was intubated. She assisted in placing an intracranial pressure monitor in the child's skull, to monitor the child's brain pressure. This procedure involved drilling into the child's skull to place the monitor. Dr. McCagg testified that very little fresh blood or cerebral spinal fluid flowed from the child's brain during this procedure.

John H. Schmidt, III, M.D., testified on behalf of the State as the neurosurgeon who treated Alex when he was admitted to the hospital. Dr. Schmidt recalled that Alex arrived at the hospital unconscious, in a coma. Alex was found to have blood on the surface of his brain and in the spinal fluid around his brain, consistent with a severe head injury. Dr. Schmidt testified that the explanation for the child's injuries, as given to him by his parents, was that three or four days earlier, Alex had fallen against a coffee table and that later Alex had fallen against a bathroom sink or commode. Dr. Schmidt testified that the injuries he saw on Alex were not consistent with this explanation. He testified that while toddlers fall quite often, they do not suffer the severe brain swelling that follows a brain injury as seen in Alex. He opined that the injury was caused by "some sort of severe exchange of energy between this victim and his environment," not by a fall against a toilet or table. Dr. Schmidt also opined that the caretakers of this child should have noticed his medical condition after the injury occurred, because the child would have likely been rendered unconscious by the injury.

The State also called Mouna Chebib, M.D., a pediatric critical care doctor at Charleston Area Medical Center who treated Alex. She testified that at the time she saw Alex he was "neurologically sick," meaning that he was not able to do neurologically appropriate things as children his own age were capable of doing. He was unresponsive and making movements that were not normal for a child. She explained that these movements indicated some form of brain injury. She reviewed the records of Alex's CT scan, which showed the presence of an acute left-side bleed of the brain. According to Dr. Chebib, this finding meant the injury happened no more than a few days before the CT scan. While Dr. Chebib deemed the injury serious at the time it was first diagnosed in the emergency

room, she testified that Alex's condition became worse as the pressure in his brain continued to increase.

Dr. Chebib testified that she spoke to both the appellant and Mr. Washburn about the child's injuries and that both indicated the child struck his head against a coffee table. Dr. Chebib testified that she did not find this explanation consistent with her clinical observations, because Alex's presenting injuries were far greater than those normally attributable to a fall against a table. She stated that the proffered explanations of the appellant and Mr. Washburn simply did not fit the facts.

Dr. Chebib also stated that at the time of the injury and thereafter, the child's caregivers would have had very little doubt that the child was in severe trouble due to the severity of Alex's heady injury. When asked if the symptoms likely exhibited by Alex would be similar to that of a child with the flu, Dr. Chebib testified that flu-like symptoms would be more consistent with fever, vomiting, diarrhea, vomiting and wanting to eat. The symptoms indicative of a head injury would instead be nausea and vomiting and being non-responsive and not interested in anything. Dr. Chebib did agree that symptoms of a head injury may include an unwillingness to eat or drink. As to the medical attention sought by the appellant, Dr. Chebib testified that it was too late and that had Alex come into the hospital earlier, he could have been saved.

The cause of Alex's death was established at trial through the testimony of James A. Kaplan, M.D., the chief medical examiner for the State of West Virginia. Dr. Kaplan's ultimate conclusion was that Alex perished as a consequence of an abusive closed head injury. Dr. Kaplan testified that he saw a large bruise on the middle and right side of Alex's forehead that showed some sign of healing by the time of the autopsy. Dr. Kaplan opined that Alex had suffered more than one significant impact to the front of his head. He noted the presence of a subdural hematoma, the result of an abusive closed head injury. The child's skull was not fractured, but the autopsy revealed clear evidence that the child's brain had moved violently as the result of an assault to Alex's head. When asked whether Alex's head injury was consistent with a fall onto a coffee table or slip and fall in a bathroom, Dr. Kaplan opined to a reasonable degree of medical certainty that the injuries were consistent with a violent assault upon the child, which caused the child's brain to move within the confines of his skull, resulting in the tearing of blood vessels in the brain. He did note some evidence of early healing changes within Alex's brain.

Dr. Kaplan was questioned about whether changes would have been apparent to the child's caretakers, even if the caretakers were unaware of the child's injuries. Dr. Kaplan opined that changes would have been apparent in Alex's behavior from the time of the injury. Dr. Kaplan testified changes in Alex's behavior would have occurred immediately after the assault took place, even though Alex's death would not have been immediate. Dr. Kaplan further testified that Alex may have become lethargic, had seizures, appeared limp, had slow or irregular breathing that he may have vomited. When asked if these symptoms could be explained by Alex having a virus, Dr. Kaplan opined that the abruptness of the changes in the child's condition would have been more indicative of a catastrophic assault. Dr. Kaplan stated that a reasonable caregiver would have brought the child to the hospital right away. As to the delay in seeking medical treatment, Dr. Kaplan testified:

> STATE: Doctor, in your opinion, if a child suffered such an injury. If Alex suffered such an injury and were immediately taken to the hospital, was there a chance that he could have survived?
>
> KAPLAN: Yes. Although it's my opinion that he probably would never have been a normal child after the assault took place. It's possible he could have lived.

At the close of the State's case in chief, the appellant moved for judgment of acquittal. In her motion, the appellant argued that the State's witnesses failed to establish "substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." The State resisted this motion, arguing as follows:

STATE: I think looking at the evidence in the most favorable to the prosecution, which is the standard, and that the State has made a prima facie case. We have the testimony of the paramedics, we have the testimony of four, now four doctors, that this child suffered severe head injuries, not consistent with the stories that the parents gave. We have four doctors, I think who all have testified if I can recall, at least three of them testified that had (sic) had treatment sought by the caretakers that this child had a chance of survival. No chance of survival based upon it not being taken to the hospital until the child becomes unconscious.

The circuit court denied the appellant's motion, finding that there was enough to allow the case to proceed to the jury.

In her responsive case-in-chief, the appellant relied upon the testimony of Harold Eugene Buttram, M.D., who was qualified as an expert[8] over the objections of the State. Dr. Buttram testified that, based upon his review of the child's medical records, Alex was probably autistic, may have suffered from a Vitamin C deficiency and probably suffered from vaccine-induced encephalitis, or inflammation of the brain, as a result of routine childhood vaccinations. Dr. Buttram opined that the encephalitis would have led to an enlarged forehead and a weaker-than-normal skull structure, that would have allowed a relatively minor trauma to lead to the traumatic brain injury that caused Alex's death. The State was allowed to extensively impeach the testimony of Dr. Buttram.[9]

The appellant also presented the testimony of her neighbor and friend, Bobbi Oliver. Ms. Oliver babysat the appellant's children the Saturday prior to the child's death. She testified that on that Saturday, Alex was suffering from diarrhea and was not feeling well from what Ms. Oliver believed was a virus. Ms. Oliver did not see the child on Sunday, but did see him on Monday. She testified that on that Monday, Alex came to her and gave her a hug and a kiss. She noticed that he had a bump on his forehead, about the size of a dime with a little line through it. Ms. Oliver testified that Alex behaved normally and was playing. She saw Alex on Tuesday morning, at around 10:30 a.m., when he and his sister were brought to her house for babysitting. Alex was still suffering from diarrhea, according to Ms. Oliver, but he was not vomiting. On Wednesday, Ms. Oliver testified that she saw Alex for a very brief period in the morning, and for a longer period in the early evening. At this time, Alex was responsive and he interacted with her. She testified that Alex became upset when he couldn't attend church with her.

The next time Ms. Oliver saw Alex was Thursday morning, in his apartment, seated on the couch. She said Alex was awake and responsive to her. Ms. Oliver stated that she witnessed the child's father offering Alex breakfast. She also overheard Mr. Washburn and the appellant discussing whether Alex should go to the doctor, because they feared he was getting dehydrated and had not had a bowel movement in two days. They asked Ms. Oliver to get her husband's car to take them to the doctor. The next time she saw the child was as he was being loaded into the ambulance for transportation to the hospital.

---

8. It is unclear in what field Dr. Buttram was qualified to be an expert. Voir dire established that Dr. Buttram was a family practice physician with 24 years of experience as a general practitioner. Dr. Buttram had also testified in other courts on the connection between vaccinations and autism, but not as a treating physician. The court ruled that Dr. Buttram could be declared an expert and be allowed to give opinion testimony but never declared in what field his expertise was.

9. The State's impeachment focused on Dr. Buttram's fee, his prior discipline by licensing authorities in the State of Pennsylvania, his entry of a consent decree with federal authorities for overcharging Medicare; his lack of board certification by any field recognized by the American Medical Association or his home state of Pennsylvania, with the exception of holding a diploma in environmental medicine; his reliance upon discredited literature linking childhood vaccinations to autism; and previous court appearances on behalf of persons charges with child abuse that causally connect the injuries with problems caused by routine childhood vaccinations.

Wendy Pauley, who was also a neighbor of the appellant's, testified on the appellant's behalf. Ms. Pauley babysat Alex on Tuesday morning, when she was asked by the child's father to watch him while he ran to a convenience store. Ms. Pauley testified that the child was lying on the couch, awake, but not feeling well. She noticed a bruise on his head. She suggested to the appellant and Mr. Washburn that they take the child to the doctor when she learned the child had fallen. Ms. Pauley testified that the parents' response was that the child had a virus. She stayed with Alex for 20 minutes and left when Mr. Washburn returned. Ms. Pauley next saw the child on Wednesday night, around 10 or 11 o'clock. She stated Alex was in his crib, jumping up and down. He seemed happy and she did not notice anything wrong with his health or demeanor. Ms. Pauley next saw Alex on Thursday afternoon. She went to the appellant's apartment to get some boxes. She was let into the apartment by Tina Carnell, and witnessed the appellant giving the child CPR.

The appellant testified on her own behalf. She denied any knowledge of anyone who may have inflicted an injury upon Alex. She testified that she did not intentionally harm her child or see any urgent medical need that required attention prior to the call to 911 on May 29, 2008. She testified that during that week, she was working, packing the apartment and making arrangements for a new place to live. Two of the appellant's four children were residing with her in the apartment; the older two were temporarily staying with her mother. The appellant testified that Alex got sick on Saturday, May 24, or Sunday, May 25, 2009. This was after two of her older children experienced diarrhea and vomiting, the cause of which she attributed to a virus. She testified that she took one of the older children to an urgent care facility in Kanawha County for treatment of poison ivy about the same time that child was experiencing these symptoms. There, she testified, the child was prescribed antibiotics for her poison ivy and the appellant was told to keep the child hydrated while she was suffering from diarrhea and vomiting.

The appellant testified that on Monday, May 27, 2008, Alex was still experiencing diarrhea and vomiting. According to the appellant, he was watching videos with his siblings when he began spinning around the living room. While doing so, she testified, Alex struck his forehead on the corner of the coffee table. Alex began crying and the appellant stated that she comforted him. Shortly afterward, Alex began playing normally. The child was put to bed at his typical time of 9:30 p.m. The appellant testified that when Mr. Washburn returned home that night, he went to check on Alex and saw that he had vomited. The appellant and Mr. Washburn then bathed the child. While in the bathtub, the child slipped and fell, striking his chin on the toilet. She testified there was only a small mark on the child's chin after that fall.

On Tuesday, May 28, 2008, Alex was still experiencing diarrhea and did not want to eat. The appellant testified, however, that he was feeling better than he did on Monday. She did not recall seeing more than a bruise on his forehead and a small mark on his chin. On Wednesday, May 29, 2008, the appellant testified that she had to work and left the child in the care of Christina Carnell. She stated that when she returned from work in the evening, the children were fine and that Alex ate some tacos and was acting normally. The appellant did not recall that Alex was experiencing vomiting or diarrhea on Wednesday.

The appellant testified that on Thursday, May 29, 2008, she did not work. She woke up about 10:30 that morning, and Alex was not awake at that time. She went in to get him out of his crib. She took him into the kitchen and placed him in his high chair. She gave him some cereal, of which he ate very little. She tried to get him to eat a granola bar, but he was not interested in that. After breakfast, she took him out of his high chair, changed his pajamas and diaper and took him into the living room to watch television. Present with Alex was Mr. Washburn and another of the appellant's children.

At some time between 11 a.m. and 12 p.m., the appellant left the apartment to visit her

neighbor, leaving Alex with Mr. Washburn. She testified that she was gone for approximately 45 minutes. After she returned to the apartment, she attempted to feed Alex lunch but stated he was not interested in eating. She gave him some Pedialyte. The appellant testified that the child was not very active on Thursday, very atypical for him. He then took a nap and awoke at approximately 5 or 6 p.m. After Alex awoke, the appellant attempted to give him something to drink but he did not drink anything.

The appellant testified that she began to worry about Alex becoming dehydrated. Mr. Washburn decided to walk to the store to get some flavored Pedialyte, leaving the appellant with the two children. Also present was Christina Carnell, who had arrived about the same time Mr. Washburn left to go to the store. The appellant testified that she attempted to feed Alex some chicken noodle soup while he was seated upright on the couch. He was not interested in eating. During her attempts to feed the child this soup Alex's breathing became labored. According to the appellant, the child's eyes rolled backward.

At this time, the appellant testified that she directed her friend to get the telephone and she began administering CPR to her son. The appellant stated that Ms. Carnell called 911, and that while all of this was happening her neighbor Wendy Pauley arrived at the apartment. The appellant testified that she directed Ms. Carnell to contact Mr. Washburn.

The appellant accompanied Mr. Washburn to the hospital, where she testified that she told medical personnel that the child had been sick, was probably dehydrated and had fallen and hit his head on Monday, May 26, 2008. The appellant also testified that she denied not taking Alex for treatment because of the fear of questions regarding the bruise on the child's forehead. To rebut this, the State called a detective from the Kanawha County Sheriff's Department at the conclusion of the appellant's case. Detective Stephanie Ferrell testified that the appellant gave a prior statement to her in which she stated she was scared to take Alex for medi-cal treatment because of the bruise on his forehead.

At the conclusion of testimony, the court instructed the jury, including instructions on the elements of the crime of child neglect causing death and reasonable doubt.[10] The jury deliberated for approximately ten and one half hours, before returning a guilty verdict on the one count of child neglect causing death against the appellant. The appellant was sentenced to three to 15 years in the penitentiary, with credit for time served prior to trial, by order entered January 12, 2009. On August 17, 2009, the appellant was resentenced to the same punishment, for the purposes of allowing a direct appeal to this Court.

## II.

## STANDARD OF REVIEW

■ This appeal contains two assertions of error. The first assertion is a challenge to the sufficiency of the evidence at trial. As we held in syllabus point one of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995):

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examined the evidence submitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

■ The appellant also argues that the circuit court erred when it did not grant a mistrial after the State's witnesses violated the court's order prohibiting the mention of child protective services during the trial. We review the circuit court's decision to grant or deny a motion for mistrial is reviewed under an abuse of discretion standard. "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of re-

---

**10.** Neither party objected to the jury charge or specific instructions read to the jury.

view. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review." Syllabus Point 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

As we explained in *State v. Williams*, 172 W.Va. 295, 304, 305 S.E.2d 251, 260 (1983) (citations omitted):

The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court. A trial court is empowered to exercise this discretion only when there is a "manifest necessity" for discharging the jury before it has rendered its verdict. This power of the trial court must be exercised wisely; absent the existence of manifest necessity, a trial court's discharge of the jury without rendering a verdict has the effect of an acquittal of the accused and gives rise to a plea of double jeopardy.

With these standards in mind, we address the appellant's contentions.

### III.

### DISCUSSION

The appellant asserts two grounds for error in the proceedings below. The appellant argues first that the State failed to prove beyond a reasonable doubt that the appellant's delay in seeking medical treatment for Alex caused his death. Second, the appellant contends that the circuit court erred in denying her motions for mistrial after, she alleges, the State violated the trial court's admonition to not reference child protective services proceedings or actions.

On her first assignment of error, i.e., that the State failed to prove beyond a reasonable doubt that Alex died because of the delay in his receiving medical treatment, the appellant posits that the State's evidence shows at most that Alex *might* have survived, not that Alex *would* have survived. The appellant contends that the mere possibility of survival is insufficient for conviction under W. Va.Code § 61–8D–4a, child neglect causing death.

In its brief to this Court, the State argues first that the appellant did not adequately preserve the sufficiency of the evidence argument as a grounds for appeal. The State argues that appellant failed to raise this issue in the trial court, thereby waiving or forfeiting the issue on appeal. We disagree. In her motion for judgment of acquittal, the appellant alleged that the State had not met its burden of proof. The appellant's specific argument was that the State's witnesses did not present "substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." This statement preserves the sufficiency of the evidence argument for appeal.

Turning to the substance of the appellant's contention that the evidence presented was insufficient for her conviction, we begin by observing that great deference should be afforded to the decision of the jury, because the jury has heard all the evidence, and has had the opportunity to weigh the credibility of witnesses and the strength of the evidence. "The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses." Syllabus point 2, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967). Thus, " '[a] reviewing court should not reverse a criminal case on the facts which have been passed upon by the jury, unless the court can say that there is reasonable doubt of guilt and that the verdict must have been the result of misapprehension, or passion and prejudice.' Syllabus point 3, *State v. Sprigg*, 103 W.Va. 404, 137 S.E. 746 (1927)." Syllabus point 1, *State v. Easton*, 203 W.Va. 631, 510 S.E.2d 465 (1998).

When the sufficiency of the State's evidence is challenged, the appellant takes on a heavy burden. Justice Cleckley aptly detailed the hurdles facing a convicted defendant challenging the sufficiency of the evidence:

A convicted defendant who presses a claim of evidentiary insufficiency faces an uphill

climb. The defendant fails if the evidence presented, taken in the light most agreeable to the prosecution, is adequate to permit a rational jury to find the essential elements of the offense of conviction beyond a reasonable doubt. Phrased another way, as long as the aggregate evidence justifies a judgment of conviction, other hypotheses more congenial to a finding of innocence need not be ruled out. We reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

State v. LaRock, 196 W.Va. 294, 303, 470 S.E.2d 613, 622 (1996). We have further held:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled."

Syllabus point 3, State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995).

Here, the appellant argues that her conviction cannot stand because none of the State's medical witnesses testified that Alex would have survived but for the failure of the appellant to take Alex for medical treatment. The appellant contends that of the four medical witnesses testifying in this trial, only Dr. Kaplan, the medical examiner, and Dr. Chebib, the pediatric critical care physician, testified about the cause of Alex's death. The

appellant cites with specificity the testimony of Dr. Kaplan, the medical examiner, who stated that there was only a possibility that the child would have survived if treatment had commenced sooner.

█ Dr. Chebib, however, was more definite. Dr. Chebib testified, without reservation, that had Alex been presented for medical treatment, he would have survived. By the time Alex did arrive at the hospital, according to Dr. Chebib, Alex was non-responsive and in a coma. He never regained consciousness. Simply put, according to Dr. Chebib, Alex's medical condition had progressed too much by the time medical treatment was sought for Alex to survive.

In State v. Thompson, 220 W.Va. 246, 647 S.E.2d 526 (2007), we also considered W. Va.Code § 61–8D–4a, the statute under which the appellant herein was convicted. In Thompson, we upheld the conviction of a father who left his child in a car seat in a vehicle for over four hours when the outside temperature was 84 degrees. The child, whose core body temperature was measured at 107 degrees Fahrenheit, died as a result of hyperthermia. Id., at 249, 647 S.E.2d at 529. The Thompson case focuses upon the actions of the father who actually left the child in the car, which actions resulted in the foreseeable death of the child by overheating, and his defense of his own unconsciousness. The Thompson facts are distinguishable from those in this case. Here, there have been no allegations that the appellant's actions directly resulted in the traumatic brain injury that ultimately led to the death of Alex Washburn.

The appellant cites cases [11] from other jurisdictions for the premise that the State must prove that the child would have survived, not that the child might have survived. In one such case from Nebraska, State v. Muro, 269 Neb. 703, 695 N.W.2d 425 (2005), a mother accused of child abuse causing death did not inflict the fatal injuries, but was accused of failing to take the child for medical treatment. In Muro, medical experts testified that the child might have sur-

11. The appellant cites an Alabama case, Ex parte Lucas, 792 So.2d 1169 (Ala.2000), and a Texas case, Johnson v. State, 121 S.W.3d 133 (Tex.App. 2003), as all dealing with parents charged with causing the death of a child by delaying the seeking of medical treatment.

vived with earlier treatment or that the child had *"a reasonable likelihood"* of survival with earlier treatment. In *Muro,* the Supreme Court of Nebraska held that this proof was insufficient, and that the State of Nebraska would have had to show beyond a reasonable doubt, that but for the defendant's delay in seeking medical treatment, the child would have survived her preexisting traumatic head injury. The Nebraska Court concluded that "viewing the evidence in this case in the light most favorable to the prosecution, a finder of fact could not reasonably conclude beyond a reasonable doubt that but for" this delay in seeking treatment, there was a reasonable likelihood that the child would have survived with early treatment. 269 Neb. at 713, 695 N.W.2d at 432.

 "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Proof beyond a reasonable doubt cannot be presumed or assumed but must be shown by the evidence presented to the satisfaction of the trier of fact.

In the case at bar, we have carefully reviewed the evidence presented by the State of West Virginia. While there is some measure of conflict between the opinions of Dr. Kaplan and Dr. Chebib on the effect of the delay of medical treatment as to the cause of Alex's death, we conclude that there was sufficient evidence to support the jury's verdict. While Dr. Kaplan was not able to state that the child would have lived with earlier treatment, Dr. Chebib did so testify. Thus, the jury verdict, when viewed in the light most favorable to the conviction itself, was supported by sufficient evidence.

We next address the appellant's contentions that the circuit court erred by not granting a mistrial when the State and one of the State's witnesses each mentioned CPS once. We review the trial court's decision to not grant a mistrial under an abuse of discretion standard.[12] To prevail, the appellant must show that the circuit court abused its discretion by failing to grant the requested mistrial. In addition, the trial court must make a finding of "manifest necessity" before declaring a mistrial, as explained in *State v. Williams,* 172 W.Va. 295, 304, 305 S.E.2d 251, 260 (1983) (citations omitted):

> The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court. A trial court is empowered to exercise this discretion only when there is a "manifest necessity" for discharging the jury before it has rendered its verdict. This power of the trial court must be exercised wisely; absent the existence of manifest necessity, a trial court's discharge of the jury without rendering a verdict has the effect of an acquittal of the accused and gives rise to a plea of double jeopardy.

We begin by reviewing the appellant's motion in limine, and the court's admonitions to counsel. The appellant requested the exclusion of references to CPS proceedings, in large part because of the different and lower burden of proof in such proceedings, thereby being potentially misleading and confusing to the jury. Should there have been a need to reference testimony from such proceedings, such as for impeachment purposes, the appellant requested that the CPS proceedings be referred to as "related proceedings" or "previous testimony." The trial court ruled that "all witnesses that the State and the defense has (sic) should be admonished to say other proceedings."

The first reference to CPS came in the State's opening statement to the jury while

---

12. "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review." Syllabus Point 3, *State v. Vance,* 207 W.Va. 640, 535 S.E.2d 484 (2000).

the State was telling the jury about the anticipated testimony of Dr. McCagg. The appellant immediately sought and obtained a bench conference wherein the appellant argued that this mention of CPS violated the lower court's ruling on the motion in limine, and that the remedy was a mistrial. The State countered that there was no mention of CPS proceedings, only a reference to the actions taken by this doctor when she encountered the victim in this case—statements that the State believed did not violate the court's ruling in limine. The circuit court agreed. The circuit court asked the appellant if she wanted a cautionary instruction read to the jury. The appellant declined the instruction, stating that it would probably draw more attention to the fact that CPS was called.

The second mention of CPS came during Dr. McCagg's direct testimony. Dr. McCagg detailed her actions taken when she encountered the victim in the emergency room and indicated that CPS was called.[13] Again, the appellant objected to the mention of CPS, and moved for a mistrial. The circuit court denied the appellant's motion. No cautionary instruction was requested or given.

On appeal, the appellant contends that the circuit court abused its discretion and should have declared a mistrial upon either mention of CPS. The State argues that the court's rulings were appropriate, because the circuit court's ruling in limine related to CPS proceedings, not to the mere mention of CPS, and that the mentions of CPS were in passing, slight and did not prejudice the appellant in any way.

■ The standard of proof in CPS proceedings for civil abuse and neglect is "clear and convincing proof."[14] Because of this lesser burden of proof, the appellant was correctly concerned about the findings made from a related proceeding with a lesser standard of proof making their way into her criminal trial. The circuit court's admonition to the State was to not introduce testimony regarding the CPS proceedings, except where necessary upon rebuttal, and where necessary upon rebuttal, to refer to those proceedings as "related proceedings" or "other proceedings."

---

13. The paramedic and other medical personnel would have been required to report this child's injuries to the West Virginia Department of Health and Human Resources pursuant to W. Va.Code § 49–6A–2 (2009). This statute states:

When any medical, dental or mental health professional, Christian Science practitioner, religious healer, school teacher or other school personnel, social service worker, child care or foster care worker, emergency medical services personnel, peace officer or law-enforcement official, humane officer, member of the clergy, circuit court judge, family court judge, employee of the Division of Juvenile Services or magistrate has reasonable cause to suspect that a child is neglected or abused or observes the child being subjected to conditions that are likely to result in abuse or neglect, such person shall immediately, and not more than forty-eight hours after suspecting this abuse, report the circumstances or cause a report to be made to the Department of Health and Human Resources: Provided, That in any case where the reporter believes that the child suffered serious physical abuse or sexual abuse or sexual assault, the reporter shall also immediately report, or cause a report to be made, to the State Police and any law-enforcement agency having jurisdiction to investigate the complaint: Provided, however, That any person required to report under this article who is a member of the staff of a public or private institution, school, facility or agency shall im-mediately notify the person in charge of such institution, school, facility or agency, or a designated agent thereof, who shall report or cause a report to be made. However, nothing in this article is intended to prevent individuals from reporting on their own behalf.

In addition to those persons and officials specifically required to report situations involving suspected abuse or neglect of children, any other person may make a report if such person has reasonable cause to suspect that a child has been abused or neglected in a home or institution or observes the child being subjected to conditions or circumstances that would reasonably result in abuse or neglect.

14. " ' "W. Va.Code, 49–6–2(c) [1980], requires the State Department of Welfare [now the Department of Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition ... by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.,* 168 W.Va. 366, 284 S.E.2d 867 (1981).' Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.,* 184 W.Va. 60, 399 S.E.2d 460 (1990)." Syllabus Point 1, *In re Beth,* 192 W.Va. 656, 453 S.E.2d 639 (1994). Syl. Pt. 3, *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995).

We do not believe the circuit court abused its discretion. The circuit court did not prohibit the mere mention of CPS. Rather, the focus of the motion in limine was on CPS proceedings and the lesser standard of proof in such proceedings. Neither reference of CPS herein related to or mentioned CPS proceedings. Both of the times that CPS was mentioned was regarding the consideration which Dr. McCagg took in treating Alex. Both were references to the fact that Dr. McCagg, as a physician and a mandated reporter of Alex's grievous injuries pursuant to W. Va.Code § 49–6A–2, felt that CPS should be called. Neither reference dealt with any of the findings, testimony or other particulars of the abuse and neglect proceedings involving the appellant which followed the child's death. We therefore cannot find that the circuit court abused its discretion by not granting the appellant's motion for mistrial upon the mere mention of CPS before the jury.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Circuit Court of Kanawha County entered August 17, 2009.

Affirmed.