Certified Question Answered.

737 S.E.2d 560

**Thomas McBRIDE, Warden, Petitioner**

v.

**Joseph H. LAVIGNE, Jr., Respondent.**

No. 11–0853.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 23, 2012.

Decided Nov. 21, 2012.

Mark A. Sorsaia, Prosecuting Attorney for Putnam County, Winfield, WV, for Petitioner.

Gregory L. Ayers, Deputy Public Defender, Charleston, WV, for Respondent.

PER CURIAM:

Thomas McBride, Warden of the Mount Olive Correctional Complex (hereinafter "Warden"), appeals from the April 29, 2011, decision of the Circuit Court of Putnam County vacating the November 20, 1996, conviction entered against Joseph H. Lavigne, Jr., for one count of sexual assault in the first degree; one count of child abuse resulting in

serious bodily injury; and one count of incest and awarding him a new trial. As grounds for its decision to grant Mr. Lavigne relief on his habeas corpus petitions, the circuit court cited three errors committed by the trial court: (1) a jury instruction relieved the State of its burden of proof: (2) the trial court wrongly limited the defendant to four character witnesses; and (3) there was insufficient evidence to establish the defendant's guilt beyond a reasonable doubt. The Warden argues that the circuit court abused its discretion in granting the habeas petition of Mr. Lavigne on these grounds. With regard to two grounds for habeas relief that the circuit court did not formally rule upon,[1] Mr. Lavigne has asserted a cross-appeal and seeks to have this matter remanded to the circuit court for the purpose of obtaining specific findings and conclusions of law. Having fully considered the record of this matter in conjunction with the arguments raised, we reverse the circuit court's grant of habeas corpus; we refuse Mr. Lavigne's request to remand this matter back to the circuit court; and we order Mr. Lavigne immediately remanded into custody to serve the remainder of his sentence.

## I. Factual and Procedural Background

On November 20, 1996, Mr. Lavigne was convicted of sexual assault in the first degree; child abuse resulting in serious bodily injury; and incest of his then six-year-old daughter, KLL.[2] After his direct appeal to this Court was refused, Mr. Lavigne filed his initial *pro se* habeas corpus petition on July 11, 1999. Counsel was later appointed and as the circuit court relates in its April 19, 2011, order granting habeas (hereinafter referred to as "habeas ruling"), this matter lingered in the court system for over a decade.[3] An omnibus hearing was held on February 6 and 7, 2010, at which eight witnesses

1. Those two issues are the State's use of allegedly false testimony by Officer Donna Ashcraft and the trial court's decision to allow the victim to testify.

2. The victim was five years old at the time of the assault. As is our customary practice with sensitive matters involving minors, we refer to the victim by her initials only. *See In re Cesar L.,* 221 W.Va. 249, 252 n. 1, 654 S.E.2d 373, 376 n. 1 (2007).

3. As the circuit court observed, five different attorneys represented Mr. Lavigne during this time and three different circuit court judges heard the matter. In explanation of the lengthy delay, the circuit court noted missed deadlines; the filing of many supplemental petitions; and separate independent DNA testing.

offered testimony and fourteen exhibits were entered into evidence. Through the issuance of the habeas ruling, the circuit court vacated Mr. Lavigne's convictions and granted a new trial.

For purposes of discussing the grounds upon which the circuit court found constitutional error, we relate the following facts relevant to the sexual assault of KLL. In the early morning hours [4] of Sunday, February 11, 1996, a man picked KLL up from the first floor recreational room of her house where she had been sleeping next to her seven-year-old brother. She was carried out the door and across the street, where she was brutally raped [5] in a grassy playground area next to a church. When the assault ended, KLL ran back to her house while the attacker reportedly took their clothes and walked behind a second church.

Upon returning to the house where KLL indicated that everyone, including her father, was in the house, she briefly laid down next to her brother who was still asleep. She then went upstairs to retrieve a night gown and attempted to clean herself up with a towel. While in the bathroom, KLL was discovered by either her mother or her father. [6] After giving KLL a bath, her parents decided to call 911. That phone call, which was taped and played to the jury, was made after Mr. Lavigne went across the street to look for any evidence of the assault. When Mr. Lavigne called 911, he told the dispatcher that his daughter had been raped and that she kept repeating that it was him who raped her.

When the paramedics arrived, EMT Franklin Stover spoke with KLL while she was lying on the couch, wrapped in a blanket, and crying. After he got her to remove the blanket so he could observe her injuries, he saw that she was bleeding from her vaginal area. [7] When Hurricane police officer Ronald Lee Smith arrived, Mr. Lavigne was fully cooperative. He allowed the home to be searched several times; he agreed to provide blood and pubic hair samples as well as the clothing that he was wearing that day; and he gave the police a statement. [8]

Officer Smith testified that KLL told him when they first met that her assailant was her father and that he looked "just like my daddy." [9] EMT Stover also testified that KLL stated that her father was the one who sexually assaulted her. Mr. Stover, who rode in the back of the ambulance with KLL and Mrs. Lavigne, testified that Mrs. Lavigne kept telling KLL that it could not have been Mr. Lavigne as he was in bed next to her. [10] Mr. Stover testified that each time KLL's mother tried to convince her daughter that it could not have been her father, KLL insisted it was. [11] The second EMT, Franklin

4. While there is no established time for the rape, KLL stated that it was just starting to get light. The only other time reference was the 911 call Mr. Lavigne made at 7:56 a.m. that morning. He told the dispatcher that he found KLL "around seven-thirty" a.m.

5. The circuit court related in the habeas ruling: "The sexual assault literally ripped KLL's vaginal area. The damage was so extensive that it tore through her sphincter muscles. KLL was left bloody and ... gaping wide open."

6. Initially, Mrs. Lavigne told the EMT Robert Stover that she was the person who found KLL and that she then went and woke her husband up. At trial, however, Mrs. Lavigne testified that Mr. Lavigne was the one who found KLL and that he had then awakened her.

7. KLL had to have extensive surgery to repair the damage caused by the sexual assault. One of the examining physicians, Dr. Joan Phillips, testified that KLL's injuries were the most extensive vaginal injuries she had ever seen.

8. Based on the statements of KLL, Mr. Lavigne was arrested later that same day and charged with the sexual assault.

9. Officer Stover testified that when he initially asked her if she could tell him what happened to her, she nodded her head yes, and then "looked me in the eye and she said her daddy picked her up, carried her out across the street to the church parking lot, and hurt her."

10. Mrs. Lavigne testified that she was a light sleeper and that she would have known if her husband had gotten up from the bed they shared.

11. EMT Stover testified that Mrs. Lavigne corrected KLL on the color of pants the attacker was wearing. In an apparent attempt to convince KLL that the man who harmed her could not have been her father, Mrs. Lavigne said, "'Remember, you said the man had on green pants.'" "And the child said, 'No mommy, they were just like daddy has on.'" Mr. Stover further testified that when Mrs. Lavigne tried to correct

Humphreys testified that when KLL "was with her parents she would say 'a man who looks like my father, or my daddy' and when she was not she referred to the person as 'my daddy.'" This same type of discussion between KLL and her mother was overhead by Dr. Joan Phillips and Dr. Kimberly Martin, who both examined KLL at the hospital. In describing the incident to Dr. Phillips, KLL had stated a man "that looks like my daddy" "put me on the grass and he took my pants off and put his pee-pee in mine."[12] Dr. Martin testified that at one point when Dr. Phillips was out of the examining room, KLL "turned to her mother and was very adamant," saying "It was daddy." Despite Mrs. Lavigne's attempts to dissuade KLL as to who the assailant was, Dr. Martin testified that she "continued to say it was daddy."

At trial, when KLL was asked if she knew who had raped her she stated "I don't know." When the State asked her if she had ever seen the person who hurt her, the trial transcript reflects that "the witness turned slightly in chair and looked at the Defendant." She nodded affirmatively in response to the State's questions of whether she remembered telling her mom what had happened to her and who had done this to her. KLL testified "I told her and daddy." She also nodded in an affirmative fashion when asked if she recalled telling Dr. Phillips what had happened to her upon her arrival at the hospital. When the State tried one last time to get her to make an in-court identification of her attacker, asking "Do you remember who that person that hurt you looked like?" and prompting her with "I think you told Dr. Phillips who it looked like," the trial transcript indicates that the "witness looked over her right shoulder and pointed to the Defendant."

There was no forensic evidence connecting Mr. Lavigne to the crime. Dr. Martin testified that the sample collections they took at the hospital were affected by the severity of KLL's injuries, the amount of bleeding, and

the bathing. She also testified the extensive degree of tearing prevented them from taking vaginal washings.

Mr. Lavigne testified that when he asked KLL what happened, she "look[ed] at me and said in his wife's presence: "Well, my daddy carried me outside and he hurt me." When asked about being questioned by the police as to whether he could have committed the rape, Mr. Lavigne testified that he had said: "No, I didn't do this. If I did it, I don't remember doing this." Explaining his remarks further, he said: "And If I have done this, it had to have been in a fugue state, which is like driving down the road and you don't remember the last five miles. But I didn't. I didn't do this, and there's no way I could do this." Officer Steve Young of the Hurricane Police Department testified that when he asked Mr. Lavigne later that morning whether he had done this to his daughter, he responded: "That if he had done it he would not remember it."

## II. Standard of Review

As we explained in syllabus point one of *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006), our review is governed by the following standards:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Because the trial court concluded that the evidence was insufficient to convict Mr. Lavigne, we also rely upon standards this Court first adopted in *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). As we explained in syllabus point one, "the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

---

her daughter on which of two doors was used for egress and ingress, KLL "said, 'no, mommy, daddy carried me out the back door. I ran back in that door after daddy hurt me.'"

12. Dr. Phillips testified that when she asked KLL what happened, "she said that a man, and her quote was, 'that looks like my daddy', but the inflection in her voice was, 'if it wasn't, he sure looked like my daddy." KLL told Dr. Phillips "'It really looked like my daddy.'"

essential elements of the crime proved beyond a reasonable doubt." *Id.* at 663, 461 S.E.2d at 169. Recognizing the "heavy burden" a defendant has when challenging the sufficiency of the evidence, we held in syllabus point three of *Guthrie* that "a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilty beyond a reasonable doubt." *Id.* With these standards in mind, we proceed to determine whether the circuit court's grant of habeas corpus was in error.

### III. Discussion

We will separately address the three grounds upon which the circuit court found there to be a basis for granting habeas relief: instructional error; character witness limitation; and sufficiency of the evidence.

### A. Instructional Error

■ The circuit court concluded that Mr. Lavigne's constitutional right to a fair trial[13] was violated by the giving of one particular instruction. That instruction stated as follows:

> The Court instructs the jury that a conviction for any sexual offense may be obtained on the uncorroborated testimony of the victim, unless such testimony is inherently incredible.

> Thus, if you believe the testimony of [KLL] beyond a reasonable doubt you may return a verdict of guilty under the indictment.

The first sentence of the instruction fully comports with our holding in syllabus point five of *State v. Beck,* 167 W.Va. 830, 286 S.E.2d 234 (1981), that "[a] conviction for any sexual offense may be obtained on the uncorroborated testimony of the victim, unless such testimony is inherently incredible, the credibility is a question for the jury."

■ As support for its finding of instructional error, the circuit court looked to our

holding in syllabus point one of *State v. O'Connell,* 163 W.Va. 366, 256 S.E.2d 429 (1979), in which we recognized that "[i]n a criminal prosecution, it is constitutional error to give an instruction which supplies by presumption any material element of the crime charged." Because KLL did not verbally identify Mr. Lavigne *at trial* as her attacker, the circuit court determined that it was error to give the instruction at issue. According to the habeas ruling, the instruction "misled the jury into believing KLL's testimony was sufficient to establish the elements of the offenses, and thus for conviction."

The circuit court summarized KLL's trial testimony regarding the identity of her attacker into three components: "[H]er assailant resembled her father; a supposed glance at Mr. Lavigne when re-asked if she knew her assailant; and an affirmative answer that she did not know the identity of her assailant." After categorizing KLL's trial testimony, the circuit court went to great pains[14] to discredit the "supposed glance" towards Mr. Lavigne. When the State asked KLL if she had ever seen the person who hurt her, the trial transcript indicates that "the witness turned slightly in chair and looked at the Defendant." Not only did the circuit court castigate the court reporter for including this parenthetical notation, the circuit court theorized that the glance was fabricated.[15] And yet at the habeas hearing, Mr. Lavigne's own trial counsel, Barbara Allen, gave testimony that confirms the occurrence of the look under discussion. When Barbara Allen was asked by the prosecutor to clarify whether there was a look or a gesture made by KLL, she answered:

> Those were two separate things. At one point, at the very end of his examination, Bill Rardin [co-prosecutor] said to [KLL], "and who did this man look like?" And she kind of looked and pointed at her father, which was not any different from anything she'd ever said before.

---

13. *See* W.Va. Const. art. III, § 14.

14. The circuit court discussed this issue for more than five pages as part of its habeas ruling, quoting from various court reporter handbooks regarding the use of parenthetical notations, and going so far as to suggest that the reporter ex-

ceeded her authority by including the subject notation without being expressly instructed to do so by the court or the attorneys.

15. The circuit court said "it is not likely that the event occurred."

But there was another instance, and I don't remember—you know, I don't have a transcript, but I remember that the court reporter actually noted it in the transcript. She was asked some kind of a question by the Prosecutor and she looked at her father. And I remember that in the closing arguments, Bill Rardin pounded and pounded that look at her father.

Given this validation by defense counsel of the occurrence of the glance under discussion and its usage by the State during closing argument,[16] we find the circuit court's analysis on this issue to be infirm.

The Warden argues, and we agree, that the circuit court wrongly came to the conclusion that the instruction at issue could only be given if KLL's testimony addressed each and every element of the crimes charged. If there had been no evidence at trial which pointed to Mr. Lavigne as KLL's attacker, our analysis would be different. But the record makes clear that the trial testimony of EMT's Stover and Humphreys, Doctors Phillips and Martin, Officer Smith, and the victim's parents all pointed to Mr. Lavigne as the attacker based on KLL's statements in the time span immediately following the sexual assault. And when she took the stand at trial, KLL verified that she had told both her parents and Dr. Phillips who had hurt her. As the Warden observes, despite the fact that KLL either lacked the will or the desire to verbally identify her father as the assailant at trial, she did acknowledge the fact of having told other people the identity of the person who had raped her at the time of the assault. The trial testimony of the people with whom KLL spoke after the assault; her affirmation at trial of having made those statements; and her demeanor and gestures at trial all combined to provide the jury with the necessary evidence of her attacker's identity.

In making its ruling on the issue of instructional error, the circuit court failed to consider the remaining jury instructions. *See State ex rel. Hall v. Liller*, 207 W.Va. 696, 702, 536 S.E.2d 120, 126 (2000) (recognizing that habeas court has to "examine all of the instructions as a whole to determine whether the jury would have been misled"). Among the additional instructions given to the jury was the following:

> The Court instructs the jury 'if they believe the testimony of the victim in this case was uncorroborated, they should scrutinize such testimony with care and caution.' However, the jury is further instructed that 'the testimony of the victim need only be corroborated in material facts which tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the victim's testimony and need not amount to independent evidence which supports the alleged ultimate fact that the accused committed the offense charged.'

Through this instruction, the trial court clearly admonished the jury that any reliance on uncorroborated testimony was to be made in a specialized fashion—with care and caution. And, as the Warden further observes, the jury was fully apprised that the State had to overcome the presumption of innocence and to prove to their satisfaction that Mr. Lavigne had committed the charged offenses beyond a reasonable doubt before they could find him guilty of those offenses.

Upon our careful scrutiny of the record, we cannot reach the conclusion that Mr. Lavigne's constitutional right to a fair trial was violated by the giving of the *Beck* instruction. *See* 167 W.Va. at 843–44, 286 S.E.2d at 242–43; *accord State v. Haid*, 228 W.Va. 510, 721 S.E.2d 529 (2011). Neither do we reach the conclusion that the giving of the instruction violated our holding in *O'Connell* with regard to presumptively supplying a material ele-

---

**16.** As support for its position that the "supposed glance" never took place, the circuit court suggested that if it had occurred there would have been a reference to it during closing argument. In its habeas ruling, the circuit court declared that "there is no reference in closing argument by either party to the look as evidence of Mr. Lavigne's guilt." A review of the record dis- proves this statement as Mr. Rardin, the co-prosecutor, referred to KLL's testimony in closing when he asked the jury to "[t]hink back to when she sat here and looked over her shoulder, at what question was being asked and what you thought in your mind. I want you to think about that."

ment of the crime. *See* 163 W.Va. at 366, 256 S.E.2d at 430, syllabus.

## B. Character Witness Limitation

■ Mr. Lavigne's trial counsel had subpoenaed twelve individuals to testify on his behalf. By limiting him to only four character witnesses,[17] the circuit court decided that "the trial court robbed Mr. Lavigne of an opportunity to prove his character." The circuit court reasoned that "Mr. Lavigne's character as a loving father with a propensity for nonviolence were important facts for the jury to consider." By restricting the number of individuals who could offer this type of testimony,[18] the circuit court concluded that the trial court "improperly limited his ability to raise a reasonable doubt as to his guilt."

■ Rulings on the admissibility of evidence, as this Court has consistently maintained, are largely within the sound discretion of a trial court. *State v. Riley*, 201 W.Va. 708, 714, 500 S.E.2d 524, 530 (1997); *accord McDougal v. McCammon*, 193 W.Va. 229, 235 n. 5, 455 S.E.2d 788, 794 n. 5 (1995) (stating that "evidentiary decisions of a trial court are entitled to substantial deference"). And, as the provisions of Rule 403 of the West Virginia Rules of Evidence[19] make clear, a trial court has the discretionary authority to limit testimony that will be cumulative in nature.[20] *Riley*, 201 W.Va. at 714, 500 S.E.2d at 530.

To support its finding on the issue of witness limitation, the circuit court relied upon the following statement from Justice Cleckley's evidentiary handbook:

> It has been widely recognized that the trial court has the right, in the exercise of sound and reasonable judicial discretion, to limit the number of character or reputation witnesses except in a few cases where the character of a party in a civil action, or of an accused in a criminal prosecution, was in issue or one of the material and important facts in the case.

Franklin D. Cleckley, *Handbook on Evidence for W.Va. Lawyers*, Vol. 1 § 4–4(D)(8) at 4–103 (4th ed. 2000); *accord* B.H. Glenn, Annotation, *Propriety and Prejudicial Effect of Trial Court's Limiting Number of Character or Reputation Witnesses*, 17 A.L.R.3d 327, § 3a (1968 & Supp. 2011). Stressing Mr. Lavigne's need for character evidence,[21] the circuit court sought to bring this case within those rare exceptions to the above-quoted rule where the character of the accused is uniquely critical to the outcome of the case.

■ We do not find this to be a case where the trial court's evidentiary decision violated Mr. Lavigne's right to a fair trial by depriving him of the right to offer testimony in support of his defense.[22] *See, e.g.,* Syl. Pt. 3, *State v. Jenkins*, 195 W.Va. 620, 628–29, 466 S.E.2d 471, 479–80 (1995) (finding that exclusion of defendant's handwriting sample in uttering case deprived him of meaningful

---

17. The trial court limited the number of character witnesses in response to the State's objection that "if they're just going to testify the normal character testimony[,] it becomes repetitive after three or four witnesses."

18. The character witnesses testified that Mr. Lavigne had a reputation for being law abiding and scrupulously honest. They testified that he was very nurturing, a good parent, and had an extremely positive reputation as a law abiding person with high ethics. Mr. Lavigne was further described as having a "sterling" reputation, with the witness indicating he was extremely friendly, courteous, polite, and well-mannered.

19. That rule provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." W.Va.R.Evid.403.

20. Because the circuit court did not determine that Mr. Lavigne was prevented from introducing any particular type of evidence through the four character witnesses that testified, we assume that the other eight individuals would have offered similar evidence.

21. The circuit court opined that the lack of forensic evidence tying Mr. Lavigne to the crime elevated the need for character evidence to defend against the charges.

22. According to the Warden, the circuit court's conclusion that the jury should have been permitted to hear additional character evidence "beg[ged] the question as to whether or not a sex offender's reputation in the community really has any factual bearing on the question of whether or not he or she is a sex offender."

defense). The record in this case demonstrates that Mr. Lavigne was permitted to introduce evidence of his reputation and good character at trial as part of his defense.[23] Notwithstanding arguments to the contrary,[24] we remain firmly convinced that the number of character witnesses that will be permitted to testify is a matter best left to the trial court's discretion. Finding no basis from which to determine that the trial court's exercise of its discretion was improper in this case,[25] we conclude that the circuit court abused its discretion in ruling that the limitation of character witnesses to four was constitutionally deficient.

### C. Insufficiency of the Evidence

The circuit court began its analysis of this issue by correctly noting that "except in extraordinary circumstances, on a petition for habeas corpus, an appellate court is not entitled to review the sufficiency of the evidence." *Cannellas v. McKenzie*, 160 W.Va. 431, 436, 236 S.E.2d 327, 331 (1977); *see Edwards v. Leverette*, 163 W.Va. 571, 576, 258 S.E.2d 436, 439 (1979) (explaining that habeas corpus proceedings are markedly different from direct appeals because habeas corpus review is limited to constitutional error). Neglecting to identify what extraordinary circumstances justified examination of this issue on habeas review,[26] the circuit court proceeded to review this case in a manner that suggests both an invasion of the jury's fact finding province and a manifest failure to accord the State the benefit of all inferences and credibility assessments. We specifically cautioned against this type of post-trial reassessment in *Guthrie*, the decision by which we routinely examine the sufficiency of the evidence on direct appeal.

In syllabus point three of *Guthrie*, we articulated the following standard for reviewing whether the evidence is sufficient for a conviction:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

194 W.Va. at 663, 461 S.E.2d at 169. While the circuit court quoted from both *Guthrie* and also from our holding in *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996),[27] it

---

**23.** *See supra* note 18.

**24.** *See, e.g., Julian v. State*, 134 Ga.App. 592, 215 S.E.2d 496 (1975) (finding reversible error in prosecution for possession and sale of heroin where defendant was limited to five character witnesses); *State v. Padgett*, 93 W.Va. 623, 628–29, 117 S.E. 493, 495 (1923) (reversing conviction for operation of moonshine still where only two character witnesses were permitted to testify under then existing rule that evidence of good character "in respect to the trait involved in the criminal act is always admissible"); *Leverett v. State*, 18 Ala.App. 578, 93 So. 347, 351 (1922) (finding that trial court erred in refusing to permit more than six character witnesses).

**25.** While Mr. Lavigne argues that additional character witnesses "could have actually made a difference in the outcome of the trial," that assertion is mere supposition.

**26.** Mr. Lavigne incorrectly posits that our statement in *Cannellas* concerning the Court's practice of only reviewing the sufficiency of the evidence in habeas proceedings upon extraordinary circumstances is no longer accurate. The issue of whether there was sufficient evidence to convict is still primarily a matter to be resolved on *direct appeal* and *not* during a habeas corpus proceeding.

**27.** In syllabus point two of *LaRock*, we held that

> [w]hen a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign·of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as

then proceeded to misapply these axiomatic standards.

Rather than giving the required inferences and credibility assessments to the prosecution, the circuit court sought instead to dismantle the theory upon which the State successfully prosecuted Mr. Lavigne. As an initial observation, the circuit court summarily stated: "the fact that there was no physical or forensic evidence whatsoever tends to exculpate Mr. Lavigne as KLL's assailant." [28] Continuing, the circuit court stated that "in the short time between the perpetration of the crime and its discovery Mr. Lavigne did not have the opportunity to commit this crime and still be completely clean of any evidence." [29] After initially recognizing that the State was entitled to the inference that Mr. Lavigne had the opportunity to complete the crime, the circuit court discarded that inference, stating:

> This [Mr. Lavigne's commission of the crime] is unlikely given the circumstances of this case ... For Mr. Lavigne to grab KLL's clothes, run away from the house, hide KLL's clothes in such a manner as they would never be found, return to the house before KLL ..., and to clean himself so as not to have any physical evidence on him, is unlikely.

In the same vein, the circuit court rejected the prosecution's explanation for why KLL had vacillated between identifying the rapist initially as her father and then later as someone who looked like her father. Wholly discarding the testimony of EMT's Stover and Humphreys and Dr. Martin as to Mrs. Lavigne's insistent and repeated attempts at dissuading KLL that the rapist was Mr. Lavigne, the circuit court states that "the evidence does not support the assertion that Mrs. Lavigne actually pressured KLL into changing her story." Failing to consider the possible reasons as to why KLL was alternating between "it was my daddy" or "it was someone who looked like my daddy," the circuit court simply ended its discussion of this issue, saying: "The simple fact is that KLL changed her story in an erratic manner with no causal link to anything or anyone."

In contrast to how the circuit court related the evidence, the record of this case demonstrates that KLL was subjected to a recurring and corrective type of assistance by Mrs. Lavigne when she was being questioned about the assault.[30] Whether or not the circuit court viewed that "assistance" as "actual pressure," it is likely that such efforts had an affect on KLL's responses. Only by turning a blind eye to the record of this case, can you conclude, as did the circuit court, that Mrs. Lavigne's "coaching" of KLL or planting seeds of doubt into KLL's mind was a prosecutorial fiction.

In reviewing the habeas ruling, this Court is struck by the wholesale fashion in which the circuit court usurped the jury's function in this case. In *State v. Thornton*, 228 W.Va. 449, 720 S.E.2d 572 (2011), a recent appeal in which this Court reviewed the sufficiency of the evidence for a felony child neglect conviction, we observed:

> [G]reat deference should be afforded to the decision of the jury, because the jury has heard all the evidence, and has had the

among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

196 W.Va. at 299, 470 S.E.2d at 618.

**28.** Had the circuit court given the State the proper inference here, the absence of physical or forensic evidence can be accounted for by a combination of factors: the police investigation; the extremely cluttered and disheveled condition of the Lavigne home (bags of clothing were stashed everywhere); the bathing of KLL; and the extent of the injuries.

**29.** Because there is no firm time line in this case, the circuit court had no basis for concluding that

Mr. Lavigne lacked the necessary time to have hidden or discarded the subject clothes or to have cleaned himself up following the assault. *See supra*, note 4.

**30.** EMT Stover testified:

> While en route, the mother kept saying, "Just remember, just because the man looked like your daddy doesn't mean that it was your daddy. Besides, you told me that he was wearing green pants and your daddy does not have any green pants." And the child started crying and she was very, very agitated and told her mother that "Daddy hurt me with his pee-pee."

Mrs. Lavigne turned a pair of green pants that belonged to her husband over to the police.

opportunity to weigh the credibility of witnesses and the strength of the evidence. 'The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses.' Syllabus point 2, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967).

*Thornton*, 228 W.Va. at 460, 720 S.E.2d at 583. Moreover, as we instructed in *Guthrie*, "appellate review is not a device for this Court to replace a jury's finding with our own conclusion." 194 W.Va. at 669, 461 S.E.2d at 175.

Under *Guthrie*, the circuit court's duty was to consider "the evidence in the light most favorable to the prosecution" and then to determine whether "any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." 194 W.Va. at 663, 461 S.E.2d at 169, syl. pt. 1, in part. As the above excerpts from the habeas ruling demonstrate, the circuit court not only failed to accord deference to the jury's factual findings and credibility determinations but it conducted its review in a manner diametrically opposed to what is required by *Guthrie* and its progeny.

Approaching the record from the standpoint of review required by *Guthrie*, the inquiry is whether the jury was presented with sufficient evidence to convict Mr. Lavigne for the rape of KLL. While the circuit court solely focused on the trial testimony of KLL, her testimony was not the only evidence that the jury considered in reaching its verdict. Officer Smith testified that in response to his question of whether she could tell him what happened to her, KLL "looked me in the eye and she said her daddy picked her up, carried her out across the street to the church parking lot, and hurt her." When he asked how she was hurt, Officer Smith testified that KLL said: "Daddy told me if I didn't take my clothes off he was going to spank me." She further related to Officer Smith that "daddy helped her take her clothes off and he took his pants off and put his pee-pee in her pee-pee, and she pointed down toward her vaginal area." EMT Stover testified regarding the conversation that took place in the ambulance on the way to the hospital: When Mr. Stover asked KLL how she got back home after the assault, she said "I came in the back door." Mrs. Lavigne then tried to correct KLL, saying "Remember, he came in the front door and carried you out the front door naked, or back to the front door naked." KLL responded: "No, mommy, daddy carried me out the back door. I ran back in the back door after daddy hurt me."

The jury heard additional evidence of Mrs. Lavigne trying to dissuade KLL of her belief that it was her father who had assaulted her. Officer Smith testified that KLL "was in the middle of telling me what had happened" when Mrs. Lavigne "got in the back of the ambulance." Officer Smith said that KLL's mother "interrupted [KLL] and said, 'There's no way it was your daddy. Your daddy was in bed with me.'" To which, KLL responded, "'If it wasn't my daddy, it's a man that looked just like my daddy and he's got the shirt on my daddy's got on now.'" Dr. Martin similarly testified that she overheard what she described as a "quiet argument" when Mrs. Lavigne tried to convince KLL that she must be mistaken about her father being the rapist.

Q. What were the words that were spoken:

A. The child had turned to her mother and was very adamant. She said, "It was daddy. he was wearing green pants." And the mother said ... "It couldn't have been your daddy. He doesn't have green pants." But [KLL] was adamant. She would not back off. She repeatedly told her mother that it was daddy.

In addition to this testimony, the jury heard the 911 tape during which Mr. Lavigne related on five separate occasions that KLL was saying he was the person who had raped her. Mrs. Lavigne also testified at trial that the very first words KLL uttered when she asked "[KLL] what happened to you?" was "Daddy took me to the church parking lot" to which she added, "and hurt me." Additional evidence that the jury heard included Mr. Lavigne's statement that if he had committed the rape it would have been during what he

described as a "fugue state."[31] The jury was also presented with evidence regarding the delay in contacting medical help for KLL, during which Mr. Lavigne was searching for physical evidence and both Mr. and Mrs. Lavigne were undertaking efforts to clean up KLL and the house—efforts that may have contributed to the destruction of evidence.

While the circuit court sought to characterize Mr. Lavigne as having been convicted solely on conflicting and uncorroborated out-of-court statements, the record of this case proves otherwise. In stark contrast to the facts of the two cases relied upon by the circuit court, KLL never recanted the fact of the sexual assault or the fact of her initial and repeated identification of Mr. Lavigne as the person who hurt her. *See Beber v. State,* 887 So.2d 1248 (Fla.2004); *U.S. v. Bahe,* 40 F.Supp.2d 1302 (D.N.M.1998). The record is clear that KLL affirmed on the stand that she previously told both her parents and Dr. Phillips what had happened to her and who had hurt her. While KLL refused to vocalize that it was her father who had hurt her during the trial, she did not hesitate to indicate what the rapist looked like, initially with a mere glance at Mr. Lavigne and then later with an unmistakable finger pointing.

When the prosecutor summed up the evidence of this case, he asked the jury not to disbelieve KLL's account of what had happened to her, like her own mother had. Suggesting that KLL, despite her young age, knew her father's voice and his looks, he argued that she was clear and without doubt about who had hurt her from the beginning.[32] And only when her mother suggested that

she must be mistaken about the assailant's identity, did KLL say, as Dr. Phillips observed, that if you are telling me it could not be my daddy, then I will just have to say it was someone who sure looked like my daddy. What the record makes clear is that KLL did not change her story without the repeated interruptions and promptings of her mother. In his final remarks, the prosecutor left the jury to ponder why a little girl who had just been violently raped, who was bleeding and in severe pain, would refrain from going to her parents' bedroom to tell them what happened and to seek their help.[33]

Failing to consider any possible explanation for KLL's statement that her entire family was inside the house when she ran back home after the rape,[34] the circuit court focused heavily on this testimony. As we stated in *Guthrie,* "the evidence need not be inconsistent with every conclusion save that of guilt...." 194 W.Va. at 663, 461 S.E.2d at 169, syl. pt. 3. Clearly, the jury did not accord this statement as much significance as the circuit court did when it weighed KLL's testimony. That evidentiary weighing exceeded the scope of the circuit court's review of this matter. As we stressed in *Guthrie,* "[a]n appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact." *Id.* at 669 n. 9, 461 S.E.2d at 175 n. 9, *see also Lucas v. McBride,* 505 F.Supp.2d 329, 358 (N.D.W.Va.2007) (finding that issues of sufficiency of evidence to convict defendant for sexual assault "are all related to the credibility of the witnesses and the weighing of evidence...–issues that were resolved by the jury at trial and are not

---

**31.** The jury was also informed of Mr. Lavigne's immediate response of "God, no," to the paramedics upon their arrival when asked whether KLL had been sodomized. This question was asked based on Mr. Lavigne's relating that KLL was bleeding from her bottom. The inference left with the jury was how could Mr. Lavigne have known whether KLL had been sodomized unless he had been the person who committed the assault.

**32.** The prosecutor argued that the admonishment to KLL to remove her clothes or be spanked was consistent with what a parent, not a complete stranger, would say.

**33.** Dr. Phillips asked KLL if she had awakened her parents when she returned to the house, and

she indicated that she did not go into their room. The testimony of KLL's parents confirmed that she did not seek help from either of them upon her return to the house.

**34.** The jury may have reasoned that KLL's statement was based on the fact that she saw both her mother and her father in the house after the rape. And, as the Warden observed, until she actually went upstairs, KLL would have had no way of knowing whether her parents were in the house. Or, as the prosecutor argued, she may have been succumbed to pressure or suggestions from her family with regard to the events surrounding the rape.

within the province of federal habeas review").

As we observed in *Guthrie,* it is not up to a reviewing court, to decide how we would have resolved the case but only to decide whether there was sufficient evidence for the jury to find guilt beyond a reasonable doubt. *See* 194 W.Va. at 669–70, 461 S.E.2d at 175–76. While the physical evidence connecting Mr. Lavigne to the crime was admittedly nonexistent, the jury obviously found KLL to be a credible witness. Her statements, both before trial and at trial, made it clear that she had identified her father as the assailant without hesitation from the beginning to numerous individuals. When she was unable or unwilling to reidentify her father in the courtroom as the rapist, the jury had not only supposition to draw upon in explanation of that witness stand reluctance, but actual evidence of KLL having been pressured or corrected by her mother on multiple occasions into not accusing her father of the rape. The jury clearly appreciated the fact that while on the witness stand KLL affirmed her previous identification of her father as the rapist to both her mother and her father. And while she struggled to vocalize that her father was the one who had assaulted her, she did not struggle to point to him in response to the question of what the rapist looked like. Having looked at the evidence in the light that is most favorable to the prosecution, as we are required to do, we are convinced that there was sufficient evidence from which the jury could have reached its decision to find Mr. Lavigne guilty of the rape of KLL.

## D. Cross Assignments of Error

Mr. Lavigne argues that this matter should be remanded to the circuit court to obtain a ruling on two assignments of error. *See* Syl. Pt. 1, *State ex rel. Watson v. Hill,* 200 W.Va. 201, 488 S.E.2d 476 (1997) (requiring specific findings of fact and conclusions of law relating to habeas corpus contentions). Our review of the habeas ruling confirms that the circuit court did not make specific rulings on the competency of KLL to testify [35] and on the alleged false testimony of Officer Ashcraft.[36] However, as neither of these issues were raised on direct appeal, they are presumed to have been waived under our holding in syllabus point one of *Ford v. Coiner,* 156 W.Va. 362, 196 S.E.2d 91 (1972):

> Under the provisions of Chapter 53, Article 4A, Code of West Virginia, 1931, as amended, commonly known as "Post–Conviction Habeas Corpus," there is a rebuttable presumption that petitioner intelligently and knowingly waived any contention or ground in fact or law relied on in support of his petition for habeas corpus which he could have advanced on direct appeal but which he failed to so advance.

Accordingly, we find no basis for remanding this matter for purposes of addressing two issues that have clearly been waived.[37] *See* W.Va.Code § 53–4A–1(c) (2008).

Having determined that the circuit court abused its discretion in granting a new trial to Mr. Lavigne without the proper demonstration of constitutional error,[38] we reverse

---

**35.** The record demonstrates that KLL was uniformly viewed as a composed and highly intelligent child capable of telling the truth by both the prosecution and the defense. Mr. Lavigne's trial counsel testified at the omnibus hearing that had KLL not been called to the stand by the prosecution that she fully intended to call her as a witness.

**36.** Officer Donna Ashcraft testified at trial that Mark Berry, an individual against whom the Lavignes were scheduled to testify in a murder trial, could not have committed the rape as he was being electronically monitored. In fact, Mr. Berry was on home confinement but was not subject to electronic monitoring. There is no indication that Officer Ashcraft had knowledge of

the absence of electronic monitoring when she testified.

**37.** As Judge Haden observed, where habeas relief is being denied because of the litigant's failure to have raised the issue at an earlier point in time, the decision is one controlled by state law as it derives from legitimate concerns of finality. *See Coiner,* 156 W.Va. at 381, 196 S.E.2d at 102 (Haden, J., dissenting).

**38.** It has long been recognized that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. Pt. 4, *McMannis v. Mohn,* 163 W.Va. 129, 254 S.E.2d 805 (1979).

the order of the Circuit Court of Putnam County. It is ordered that Mr. Lavigne is immediately remanded into custody pursuant to the sentencing order entered in the criminal proceeding of this matter. The circuit court shall enter an Amended Sentencing Order reflecting Mr. Lavigne's actual time served, but no credit shall be given for any portion of the time that he has not been in confinement pursuant to the circuit court's April 29, 2011, order.[39] The Clerk of this Court shall issue our mandate forthwith.

Reversed.

39. Mr. Lavigne was immediately released pursuant to the circuit court's April 29, 2011, order.