# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-01893-COA

CHAD WILLARD A/K/A CHAD WAYNE
WILLARD A/K/A CHAD W. WILLARD

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/2015 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | STONE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA MCCLINTON |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF SEXUAL BATTERY AND SENTENCED AS A HABITUAL OFFENDER TO THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR EARLY RELEASE |
| DISPOSITION: | REVERSED AND REMANDED – 05/09/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**IRVING, P.J., FOR THE COURT:**

¶1.     A jury sitting before the Stone County Circuit Court found Chad Willard guilty of sexual battery.  On appeal, Willard claims the circuit court erred when it excluded a portion of his only witness's testimony based on a discovery violation.  We agree.  Accordingly, we reverse the circuit court's judgment and remand the case for a new trial.

FACTS

¶2.     As of Monday, May 14, 2012, Sally[1] had been living in a mobile home in Stone County, Mississippi, for approximately ten days. She had four roommates: Dalton and Dylan Willard,[2] Chad Knight, and Brandon Warden.[3] They began playing a drinking game that evening, and they continued until they ran through a case of beer sometime around 8:00 p.m.

¶3.     At approximately 1:00 a.m., Willard's girlfriend, Beth,[4] picked them up and drove everyone to Willard's house, where they had mixed drinks. Sally had four "big glasses." During the hour or two that they were at Willard's house, Beth got "upset" because she "thought [Sally] was acting too flirty with . . . Willard." Sometime between 2:00 and 3:00 a.m., Willard drove everyone but Beth back to the mobile home.[5] Sally, Dalton, and Brandon then drove to Harrison County to buy more beer. They got back at approximately 4:00 a.m.

¶4.     According to Sally, Willard fell asleep in Dylan's bed sometime around 5:00 a.m. Dalton and Warden also fell asleep in different beds. By 7:00 a.m., everyone who was awake

---

[1] We have substituted a fictitious name for the victim, who was twenty-one years old at the time of these events.

[2] Dalton and Dylan are Willard's twin sons.

[3] The mobile home had three bedrooms. Sally explained that one bedroom was on one end, and two bedrooms were on the other end. Ordinarily, she and Dalton slept in one bedroom, but they were not romantically involved. Dylan slept in one bedroom. Knight slept on the floor in Dylan's room. Warden slept in the third bedroom.

[4] Beth had married Willard by the time he went to trial.

[5] At trial, Sally could not remember whether everyone left Willard's house because Beth was upset. Sally also testified that she was not aware that Beth was upset "until [she] got back to the trailer and [Beth] c[a]me out there to the trailer and everybody told [her] to hide." It is unclear whether Sally meant that Beth went to the mobile home during the early morning hours of May 15, 2012.

had stopped drinking. Sally and Dylan woke up Warden and told him to move to "a little mattress on the floor in the living room." Sally and Dylan[6] were both intoxicated when they went to bed.

¶5.     Sally later testified that before they fell asleep, Willard came into the room and got into bed with them sometime around 8:00 a.m. Dylan was between Sally and Willard. When Willard told Dylan to tell Sally to take off her clothes, she "kind of just laughed it off" because she "just thought he was being a drunk pervert," and went to sleep while wearing her dress.

¶6.     When Sally woke up what she perceived as approximately an hour later, Dylan was gone, her underwear had been removed, Willard was on top of her, and they were having intercourse. She told Willard to stop, but she did not scream or yell. She did not know if Willard complied when she told him to stop because she "blacked out at that point." During direct examination, she said she did not physically try to stop him. But during cross-examination, she testified that she tried to push him away. Although she initially said that "four or five minutes" elapsed from the time that she woke up and later "black[ed] out," she later said that "[i]t wasn't a long period of time." Ultimately she said she did not know how long she was awake, but "[i]t did feel like a long time."

¶7.     When Sally finally woke up around 2:00 p.m., her underwear was on the floor, but she was still wearing her dress. She put on her underwear before leaving the bedroom. Dylan

_____

[6] At trial, Sally testified that as of May 14, 2012, she and Dylan had been having "sexual relations," but they "were just having fun." During cross-examination, she said that she "was not [in] a relationship" with Dylan.

3

was still asleep, but Dalton and Warden were shocked when Sally told them what had happened. She took a shower, and she did not immediately contact authorities because she was scared and "[k]ind of in shock."

¶8. There are conflicting accounts regarding when Sally first reported Willard. According to Sally, she went to her mother's house later that day, which would have been May 15, 2012. She also said that "it was like maybe two hours before the police got there." However, Investigator Ray Boggs said that Sergeant Adam Guidry called him about Sally's report around 8:00 p.m. on May 16, 2012. In any event, Sergeant Guidry drove Sally to the sheriff's department on May 16, 2012, where she met with Investigator Boggs, who later described her as "distraught," "upset," and "very emotional." Sally gave him a written statement, and the unwashed dress and underwear that she wore Monday night and Tuesday morning.

¶9. The next morning, Investigator Boggs took Sally's clothes to the Mississippi Crime Laboratory. He then went to Willard's house. At Investigator Boggs's request, Willard met with him at the sheriff's department. In a short written statement, Willard admitted that he slept at the mobile home, but he said he did not have sex with Sally. That evening, Sally underwent a sexual-assault examination.

¶10. Investigator Boggs went to the mobile home to contact Dalton, Dylan, Warden, and Knight. No one answered the door on May 17, 2012. Investigator Boggs went back the next day, but no one answered the door then, either. Investigator Boggs later testified that he "eventually spoke with them," but "[t]hey were very uncooperative." Eventually, three people gave short undated statements. Only Dylan's was mentioned with any specificity.

4

Overall, Investigator Boggs opined that Dalton, Dylan, Knight, and Warden simply did not want to be involved in the case. Investigator Boggs did not contact Beth, because no one mentioned her during his investigation.

¶11. At trial, the prosecution called Sally, Investigator Boggs, the nurse practitioner who performed the sexual-assault examination, and two expert witnesses employed by the Mississippi Crime Laboratory. The nurse practitioner who performed the sexual-assault examination explained that Sally did not have any vaginal trauma, but there was recent bruising on her fingers, lower back, left inner thigh, and left leg. The expert witnesses testified that seminal fluid was on Sally's underwear, and DNA testing revealed a profile that was consistent with Willard's. In other words, Willard's semen was recovered from Sally's underwear.

¶12. After the prosecution rested its case-in-chief, Willard called Dylan. Willard's lawyer said that Dylan's "testimony would be limited to mainly impeachment of" Sally.[7] Willard also announced that Dylan would be his only witness. The prosecutor said that Willard's lawyer had "advised [him] as soon as [Willard's lawyer] found [Dylan]." Although Willard's lawyer did not discuss his efforts to find Dylan, he said that "we never found out where Dylan was." The prosecutor argued that Willard should have been able to find Dylan earlier, and "[i]t's not . . . like they didn't know about [Dylan] or know where he was." The

---

[7] Willard's trial began on July 28, 2015. That day was devoted solely to selecting the jury. The next morning, the circuit court heard unrelated pretrial motions in limine before stating that it would "reserve the matter of the other witness that we discussed in chambers on Mr. Dylan Willard . . . ." That in-chambers discussion was not transcribed, but we deduce that Willard's lawyer had announced his intent to call Dylan as a witness.

prosecutor objected, again noted that Dylan had given a "very, very short statement," and said that aside from that it would be for impeachment purposes, he was uninformed about what Dylan's "potential testimony [was] going to be."

¶13. When asked for a proffer, Willard's lawyer said that Dylan would testify:

> That [Dylan] and [Willard] were in bed, and [Sally] came in and joined them. That she was still awake when [Dylan] left and went into another bedroom. That in the morning, she woke up, she acknowledged that she had sex with [Willard and she f]elt shamed. She stayed there the remaining part of the day and the night. And [she] did not leave until the next day, the 16th.

The prosecutor quoted Dylan's statement: "We were drinking at my house[. M]y dad went to sleep first[. T]hen me, my bro, [Knight], and [Sally] stayed up drinking. Then I went to sleep a couple hours later. No rape took place at my house." The prosecutor further noted that the case had been pending since 2013, "[a]nd not until last night was the [S]tate advised that [Dylan] was going to testify about this."

¶14. In response to the circuit judge's questions, Willard's lawyer conceded that he had received Sally's written statement during discovery, so he had reason to anticipate her testimony that Willard got into bed with Sally and Dylan. Willard's lawyer also confirmed that after he received Sally's statement, he had time to produce witnesses who could impeach her "prior to last night." The circuit judge then announced that he was "going to sustain the State's motion in limine as a discovery issue and prevent [Dylan] from testifying to impeach [Sally] with something that [Willard and his lawyer had] known since discovery . . . ."

¶15. However, the circuit judge said that Dylan could testify that Sally was ashamed on the morning of the 15th, and that she stayed at the mobile home until she left on the 16th. The

6

circuit judge also gave the prosecutor time to interview Dylan. After the circuit judge clarified his ruling, he commented that "the way to remedy all of this is to declare a mistrial and wait a month and interview him and he is not a brand new witness anymore. We're not going to do that."[8] After a ten-minute recess, Willard announced that he was not going to testify.

¶16. During direct examination, Dylan testified that he woke up around noon on the 15th, and Sally was in the living room with Dalton and Knight. Dylan said that Sally was ashamed because she had sex with Willard, but she "shrugged it off." Contrary to Sally's testimony, Dylan said that she spent the rest of the day and night drinking with him and their friends at the mobile home, and she did not leave until the following day.

¶17. The jury ultimately found Willard guilty of sexual battery. Following a bifurcated proceeding, the circuit court found that Willard qualified for enhanced sentencing as a habitual offender as set forth in Mississippi Code Annotated section 99-19-81 (Rev. 2015). Consequently, the circuit court sentenced Willard to thirty years in the custody of the Mississippi Department of Corrections without eligibility for parole or early release. Willard appeals.

DISCUSSION

¶18. Willard's appellate counsel argues that the circuit court erred when it (1) excluded portions of Dylan's testimony; (2) granted two of the prosecution's proposed jury

---

[8] "Given that the trial judge actually considered whether to delay the trial, the State's failure to make such a request is moot." *Pelletier v. State*, 207 So. 3d 1263, 1270 (¶32) (Miss. Ct. App. 2016), *cert. granted*, 204 So. So. 3d 291, *cert. dismissed*, 2014-CT-00869-SCT (Jan. 19, 2017).

instructions; and (3) denied Willard's motion for a new trial. Willard also filed a pro se supplemental brief. Within it, Willard argues that his trial counsel was ineffective because he prevented Willard from moving for a speedy trial; entertained or initiated plea discussions despite Willard's insistence that he would not plead guilty; failed to ensure that the transcript included voir dire;[9] failed to prevent someone who knew Investigator Boggs from serving on the jury; and "failed in his duties to introduce" witnesses.

*I.     Dylan's Excluded Testimony*

¶19.    Willard claims that the circuit court erred when it limited Dylan's testimony. "In reviewing rulings of a trial court regarding matters of evidence, relevancy[,] and discovery violations, the standard of review is abuse of discretion." *Myers v. State*, 145 So. 3d 1143, 1147 (¶10) (Miss. 2014). Our review involves determining "(1) whether such a violation occurred and, if so, (2) whether the exclusion of this evidence was an appropriate remedy." *Id*. at 1148 (¶10).

¶20.    As discussed above, the circuit court granted the State's "motion in limine as a discovery issue" and held that Dylan would not be allowed to testify that Sally got into bed with him and Willard, and she stayed in the bed with Willard after he left. Willard has a constitutional right to call witnesses in his favor. *See* U.S. Const. amend. VI; Miss. Const. art. 3, § 26. But his right to do so is balanced against his obligation to disclose the witnesses he intended to call at trial, including those who "by the exercise of due diligence may [have] become known[] to the defendant or defendant's counsel." URCCC 9.04(C).

---

[9] The record was supplemented with the voir dire transcript.

8

¶21.   However, "exclusion of evidence is a radical sanction that ought be reserved for cases in which the defendant participates significantly in some deliberate, cynical scheme to gain a substantial tactical advantage." *Myers*, 145 So. 3d at 1149 (¶15).  It is not enough to show that evidence was recently discovered. *Id*. at (¶16).  "[T]he record must contain evidence that the defendant committed a discovery violation to obtain a tactical advantage before exclusion becomes the appropriate sanction."  *Overton v. State*, 195 So. 3d 715, 718 (¶10) (Miss. 2016).

¶22.   Willard certainly knew about Dylan's involvement in the case.  Dylan gave a very short written statement that Investigator Boggs memorialized in his notes.  The prosecution apparently gave Investigator Boggs's notes to Willard's lawyer during discovery, although the record does not specify when that occurred, and it is unclear what Investigator Boggs's notes said.  So the problem was not that Willard's lawyer had only recently learned about Dylan's involvement or status as a potential witness – it was that Willard's lawyer had only recently located Dylan and disclosed his intent to call Dylan as a witness.  Willard's lawyer said that he had not been able to find Dylan.  Beyond that, there was no discussion on the record regarding Willard's lawyer's efforts.

¶23.   Dylan's subsequent testimony revealed that he had not been in contact with Willard, and there were reasons that he may have been difficult to locate.[10]  But the circuit judge could

---

[10] Dylan said that he had only seen Willard "off and on throughout [his] life," and he had not "been with [Willard] . . . this past few years."  According to Dylan, he changed his "phone number so much [that Willard could] barely even find [him]."  During the pendency of Willard's trial, Dylan had been arrested and temporarily detained on unrelated charges. He had never contacted anyone about the case, because he thought his "part" would only involve testifying in court.

not have known that at the time he made his decision. In any event, the prosecutor said that Willard's lawyer had "advised [him] as soon as he found" Dylan. Still, that provides no clarity regarding Willard's efforts to locate Dylan.

¶24. However, as mentioned above, the Mississippi Supreme Court has held that "the record must contain evidence that the defendant committed a discovery violation to obtain a tactical advantage before exclusion becomes the appropriate sanction." *Overton*, 195 So. 3d at 718 (¶10). The supreme court has also "rejected a posture in which [an appellate court] assume[s] that recently discovered evidence is part of some scheme to defraud justice and require the defendant to prove otherwise." *Id*. In *Pelletier*, 207 So. 3d at 1266-67 (¶¶13-16), this Court addressed a claim that a trial court had improperly excluded a witness – the defendant's stepfather and boss – because the defendant did not disclose the witness until after the State had rested its case-in-chief. We upheld the trial court's decision, because the witness was not difficult to locate, the defendant withheld the witness's identity until after the State rested its case-in-chief, and the defendant offered "no legitimate excuse for his blatant violation of the discovery rules." *Id*. at 1270 (¶31).

¶25. Here, the prosecution was equally aware of Dylan's involvement in the case. Additionally, Willard's lawyer disclosed his intent to call Dylan before the prosecution called its first witness. And Willard's lawyer explained that he had only recently been able to contact Dylan. Presumably, Willard should have been able to contact Dylan earlier, but that is based on the presumption that they had a normal father-son relationship. The circuit court was not aware of the nature of Willard's and Dylan's relationship until Dylan testified on the

10

subject. Based on the evidence that existed at the time of the circuit judge's ruling, it was an abuse of discretion to assume that Willard or his lawyer must have been in contact with Dylan earlier, or otherwise knew how to contact him. The prosecutor conceded that Willard's lawyer had disclosed Dylan as soon as possible. Because there was no evidence that Willard's late disclosure of Dylan was motivated by a desire to obtain a tactical advantage at trial, the circuit court erred when it limited Dylan's testimony.

¶26. It is unnecessary to reverse the circuit court's judgment and remand the case for a new trial unless Willard can demonstrate that he was prejudiced or harmed by the exclusion of Dylan's testimony. *See Myers*, 145 So. 3d at 1150 (¶18). In *Ross v. State*, 954 So. 2d 968, 1101 (¶68) (Miss. 2007), the Mississippi Supreme Court found that the credibility of the only witness to a crime was "crucial," so the defendant had been prejudiced by the exclusion of the witness's prior inconsistent statement despite the fact that the defendant's lawyer was allowed to impeach the witness regarding her prior inconsistent statement.

¶27. Similarly, Dylan's excluded testimony tended to impact Sally's credibility by suggesting that her recollection of the events was flawed. Dylan's excluded testimony would have contradicted Sally's testimony that Willard got into bed with her and Dylan. Otherwise, he would have contradicted her testimony that she fell asleep when he was still in the bed, and she did not wake up before she realized that Willard was having sex with her. At best, Dylan's excluded testimony would have tended to show that Sally got into bed with him and Willard, and she chose to remain there after Dylan left. That would not tend to prove that Sally had consensual sex with Willard.

11

¶28. However, as in *Ross*, Sally's credibility was crucial, and Dylan's excluded testimony could have diminished her credibility. There was also evidence that Willard's girlfriend was upset because Sally acted "too flirty" with Willard. Sally testified that she did not scream or yell when she realized that Willard was on top of her. She also testified inconsistently regarding whether she had tried to push Willard away. And although she testified that she could not remember how long she and Willard had sex, she also testified that it might have been four or five minutes. Finally, she testified that she did not know whether Willard complied when she told him to stop, because she "blacked out at that point." The supreme court has held that reversible error resulted from the exclusion of a witness whose testimony "reflected on the credibility of [a defendant's] accuser." *Skaggs v. State*, 676 So. 2d 897, 903-04 (Miss. 1996).

¶29. Under the totality of the circumstances, we are compelled to follow Mississippi precedent and find that Willard was prejudiced by the circuit court's improper exclusion of the testimony at issue. It follows that we must reverse the circuit court's judgment and remand the case for a new trial. We find that all remaining issues are moot. However, one issue bears discussion based on this Court's recent decision on the subject matter.

II. *Jury Instruction S-6*

¶30. According to Willard, the circuit court erred by give instruction S-6 over his lawyer's objection. Instruction S-6 stated that "the uncorroborated testimony of a sexual battery victim alone is sufficient to sustain a conviction for sexual battery where it is consistent with the circumstances." Willard acknowledges that the substance of the instruction is a principle

12

that is often discussed incident to an appellate review of the sufficiency of the evidence. *See Bozeman v. State*, 208 So. 3d 1091, 1093 (¶6) (Miss. Ct. App. 2017). But Willard argues that instructing the jury on that principle operated as an improper comment on the evidence. Willard further claims that the instruction "encouraged circumvention of the [S]tate's obligation to prove guilt beyond a reasonable doubt" and that it gave the jurors the impression that they could find him guilty "even if [they] found Sally's testimony was not believable." "Jury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion." *Moody v. State*, 202 So. 3d 1235, 1236-37 (¶7) (Miss. 2016). Furthermore, an appellate court must review the jury instructions as a whole, and when they "fairly – although not perfectly – announce the applicable primary rules of law" we will not find reversible error. *Id*. at 1237 (¶7).

¶31. Willard is correct that "[t]he judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence; but at the request of either party he shall instruct the jury upon the principles of law applicable to the case." Miss. Code Ann. § 99-17-35 (Rev. 2015). However, in *Parks v. State*, 2015-KA-01607-COA, 2017 WL 499171, **13-14 (¶¶70-72) (Miss. Ct. App. Feb. 7, 2017) (petition for cert. filed Apr. 5, 2017), this Court upheld a trial court's decision to give a practically identical instruction. We held that the instruction in that case was not a comment on the evidence, and it did not "tell the jury how to weigh the credibility of [the victim's] testimony." *Id*. at *13 (¶71). We further noted that other instructions informed the jurors that they must find that the defendant was guilty beyond a reasonable doubt. *Id*. Other jurisdictions have reached similar results.

*See Daniel v. State*, 675 S.E.2d 472, 477 (Ga. Ct. App. 2009) (finding no error because the instruction was a correct statement of law, and the trial court gave other instructions regarding the prosecution's burden of proof); *State v. Clayton*, 202 P.2d 922, 925 (Wash. 1949); *McBride v. Lavigne*, 737 S.E.2d 560, 567 (W.V. 2012).

¶32.    However, in *Ludy v. State*, 784 N.E.2d 459, 460 (Ind. 2003), the Indiana Supreme Court reviewed a claim that a trial court had improperly given the following instruction: "A conviction may be based solely on the uncorroborated testimony of the alleged victim if such testimony establishes each element of any crime charged beyond a reasonable doubt." The *Ludy* court held:

> The challenged instruction is problematic for at least three reasons. First, it unfairly focuses the jury's attention on and highlights a single witness's testimony. Second, it presents a concept used in appellate review that is irrelevant to a jury's function as fact-finder. Third, by using the technical term "uncorroborated," the instruction may mislead or confuse the jury.

*Id*. at 461. The *Ludy* court added that "[t]o expressly direct a jury that it may find guilt based on the uncorroborated testimony of a single person is to invite it to violate its obligation to consider all the evidence." *Id*. at 462. The Indiana Supreme Court also concluded that jurors "may interpret this instruction to mean that baseless testimony should be given credit and that they should ignore inconsistencies, accept without question the witness's testimony, and ignore evidence that conflicts with the witness's version of events." *Id*. Three other jurisdictions agree that the instruction at issue is improper. *See Gutierrez v. State*, 177 So. 3d 226, 233-34 (Fla. 2015); *State v. Stukes*, 787 S.E.2d 480, 483 (S.C. 2016); *Veteto v. State*, 8 S.W.3d 805, 816 (Tex. Ct. App. 2000) (abrogated on other grounds by *State v. Crook*, 248

14

S.W.3d 172, 177 (Tex. Crim. App. 2008)).

¶33. As it currently stands, this Court's decision in *Parks* is binding precedent in Mississippi, although the petition for writ of certiorari in that case is still pending at this time. In the event that a similar instruction becomes an issue on remand, the parties and the circuit court should be aware of any developments in *Parks*. Nevertheless, stare decisis and the current state of the law require that we find no merit to this issue.

¶34. **THE JUDGMENT OF THE STONE COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO STONE COUNTY.**

**LEE, C.J., ISHEE, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., BARNES AND WILSON, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**